**DANA SNIEGOCKI, ESQ.**
Nevada Bar No. 11715
E-mail: dsniegocki@hkm.com
**HKM EMPLOYMENT ATTORNEYS LLP**
101 Convention Center Drive, Suite 600
Las Vegas, NV 89109
Tel: (702) 577-3029
Fax: (702) 577-3029

**ERIN S. NORGAARD, ESQ.**
Washington Bar No. 32789
E-mail: enorgaard@hkm.com
**HKM EMPLOYMENT ATTORNEYS LLP**
600 Stewart Street, Suite 901
Seattle, WA 98101
Tel: (806) 826-5360
Fax: (806) 826-5360
*Admitted Pro Hac Vice*

**ARTUR DAVIS, ESQ.**
Alabama Bar No. 3672D-56A
Email: adavis@hkm.com
**HKM EMPLOYMENT ATTORNEYS LLP**
2024 3rd Avenue North, Suite 212
Birmingham, AL 35203
Tel: (404) 220-9165
Fax: (404) 220-9165
*Admitted Pro Hac Vice*

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| DEARICA HAMBY, an Individual,<br><br>Plaintiff,<br><br>vs.<br><br>WNBA, LLC and LAS VEGAS BASKETBALL L.P. d/b/a LAS VEGAS ACES,<br><br>Defendants. | **CASE NO.: 2:24-cv-01474-APG-DJA**<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT WNBA LLC'S MOTION TO DISMISS (ECF NO. 14)**<br><br>**AND**<br><br>**COUNTERMOTION FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT** |

Comes now Plaintiff Dearica Hamby, by and through her counsel of record, HKM Employment Attorneys LLP, and files this Memorandum Brief in Opposition to the Motion to

1  Dismiss by Defendant WNBA, LLC (ECF No. 14). Hamby relies on the following facts and legal

2  authority.

3  **MEMORANDUM OF POINTS AND AUTHORITIES**

4  **I.    INTRODUCTION**

5       Dearica Hamby ("Hamby") has been one of the WNBA's most consistently accomplished

6  athletes for nearly a decade. She is a three-time All Star, member of the Las Vegas Aces' first

7  league championship team, two time winner of the Sixth Woman of the Year Award, and Bronze

8  Medalist in the 2024 Paris Olympics. ECF No. 1 ¶¶ 18-24. Hamby just completed one of her most

9  dynamic seasons, earning career highs in average rebounds, assists, and points scored per game.

10      Hamby has filed this federal lawsuit under Title VII of the Civil Rights Act, 2000e(k)

11 alleging sex discrimination against the Aces for trading her after learning of her second pregnancy.

12 She also brings Title VII and Nevada law retaliation claims against the WNBA for failing to

13 investigate a complaint filed on her behalf regarding her allegations of pregnancy discrimination

14 and for subsequently declining to extend a marketing and promotional agreement after Hamby

15 exercised her rights to file charges against the Aces and the WNBA with the Equal Employment

16 Opportunity Commission ("EEOC").

17      WNBA moves to dismiss Hamby's claims under Fed. R. Civ. P. 12(b)(6). The motion turns

18 on these questions: (1) whether the complaint pleads sufficient facts to establish that the WNBA

19 is a joint employer of Hamby; (2) whether the failure to investigate a discrimination complaint is

20 a plausible claim of retaliation in this circuit; (3) whether Hamby was required to exhaust the

21 claim that the league's non-renewal of a marketing agreement was retaliatory through the EEOC

22 administrative process; (4) whether the marketing agreement needed to be an element of Hamby's

23 employment status to sustain a retaliation claim; (5) whether the pleaded allegations plausibly

24 establish that the non-renewal of Hamby's marketing agreement was plausibly connected to her

25 engaging in Title VII protected activity; and (6) whether Hamby can assert claims under Nevada

26 law for post-employment retaliatory conduct that occurs after she is traded to a California team.

27 For the reasons that follow, WNBA's motion to dismiss is due to be denied with respect to her

28

1    federal and state causes of action against the league and her claims against WNBA should proceed

2    to discovery.

3    ## II.    RELEVANT FACTUAL BACKGROUND

4    Hamby was a member of the 2022 Las Vegas Aces championship team and was eligible

5    for free agency at the conclusion of the season. ECF No. 1 at ¶¶ 18, 29. During the middle of the

6    season in June 2022, Hamby signed a two year contract extension with the Aces that would have

7    taken her through the 2024 season, just before the start of the 2025 season.  *Id*. at ¶ 28. The

8    following month, in July 2022, Hamby learned that she was pregnant. In August 2022, she

9    informed her coach and general manager of her pregnancy. *Id*. at ¶¶ 31, 32.

10    Hamby alleges that during the offseason in January 2023, her coach Becky Hammon

11    confronted her with false allegations that she (Hamby) knew of and failed to disclose her

12    pregnancy during her contract negotiations. *Id*. at ¶ 43.  Hammon told Hamby that her pregnancy

13    made her a "question mark" and suggested that the Aces had expected that she would avoid

14    bearing another child during the life of the contract. *Id*. at ¶¶ 42, 44. Hamby was informed that

15    she would be traded on January 16, 2023. Hamby's trade to the Los Angeles Sparks was publicly

16    announced on January 21. *Id*. at ¶¶ 48,49.

17    Hamby made a post on her Instagram account disclosing Hammon's false claims that she

18    deceived the Aces about her pregnancy, as well as the badgering from Hammon about whether

19    she would get pregnant again during the life of the contract. *Id*. at ¶ 50. Hamby referenced being

20    "discriminated" against and wrote that "[t[o be treated this way by an organization, by WOMEN

21    who are mothers…who preach family, chemistry, and women's empowerment is disappointing

22    and leaves me sick to my stomach. We fought for provisions that would finally protect and support

23    player parents. This cannot now be used against me." *Id*.

24    On January 23, 2023, the Executive Director of the WNBA Players Association, Terry

25    Jackson, acting on Hamby's behalf, formally requested that the WNBA conduct an investigation

26    into the allegations in Hamby's Instagram post. *Id*. at ¶ 51. On February 8, 2023, the Aces publicly

27    confirmed that they had been notified of a league investigation regarding their conduct toward

28    Hamby. *Id*. at ¶52.

On May 16, 2023, WNBA issued a press release that it had concluded its inquiry and had imposed a two game suspension on Hammon for "violating league and team Respect in the Workplace policies." *Id*. at ¶ 56. In addition, WNBA announced that the Aces would be stripped of a 2025 first round draft pick, not for practicing discrimination, but for offering Hamby an "impermissible player benefit" which, upon information and belief, was a reference to the Aces' offer to cover tuition payment for Hamby's first child's private school. *Id*. at ¶¶ 50, 29. WNBA's press statement did not reference Hamby's allegations regarding pregnancy discrimination or in any way allude to an inquiry into whether the Aces violated Title VII or any other applicable law prohibiting sex or pregnancy based bias. *Id*. at ¶ 50.

On September 23, 2023, Hamby filed an EEOC charge under Title VII alleging gender discrimination and retaliation against the Aces and retaliation against WNBA. *Id*. at ¶ 5. That charge was dually filed with the EEOC and the Nevada Equal Rights Commission. ECF No. 14-2. On October 19, 2023, the charge was amended. ECF No. 1 at ¶ 6. On October 28, 2023, a professional marketing and promotion agreement between Hamby and the league ended. ECF No. 14-1. WNBA declined to renew the contract. ECF No. 1 at ¶ 65. Hamby did not amend the charge a second time to refer to the termination of the marketing agreement. Nor does Hamby allege an independent count of retaliation based on the non-renewal. Instead, she includes it within Count III, the single retaliation count against the WNBA. *Id*. at ¶ 99.

## III.   LEGAL ARGUMENT AND CITATIONS OF AUTHORITY

### A.   Standard for Review of a 12(b)(6) Motion

A defendant is entitled to dismissal for failure to state a claim when the plaintiff fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is deemed "plausible" when the complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "[T]he complaint need only give the defendant[s] fair notice of what the…claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation marks omitted.). As long as a plaintiff states a cognizable legal theory and facts that support the theory, dismissal

1   is not warranted. *See Mendiondo v. Centinela Hospital Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir.

2   2008). At this stage of litigation, the plaintiff's pleaded allegations must be taken by the court as

3   factually true and reasonable inferences from the details in the complaint must be drawn in the

4   plaintiff's favor. *Bolden-Hardge v. Office of California State Controller*, 63 F.4th 1215, 1220 (9th

5   Cir. 2023).

6       **B.  Joint Employer Liability**

7       The Ninth Circuit resolved in *EEOC v. Global Horizons, Inc.*, 915 F.3d 631 (9th Cir. 2019)

8   that the standard for evaluating joint employer relationships in the context of Title VII is the

9   "common law agency" test, which examines whether the "extent of control that one [entity] may

10  exercise over the details of the work of the other". *Id.* at 638 (quoting *Clackamas*

11  *Gastroenterology Associates, P.C. v. Wells*, 538 U.S. 440, 448 (2003).  The circuit court has

12  cautioned that the extent-of-control analysis is not susceptible to a "shorthand formula," so "all of

13  the incidents of the relationship must be assessed and weighed with no one factor being decisive."

14  *Global Horizons*, 915 F.3d at 638. Among the "non-exhaustive" list of factors endorsed by this

15  circuit are "the duration of the relationship between the parties"; the degree to which one of the

16  parties provides benefits to the employees of the other; the "power to control" core conditions of

17  employment that are unique to the economic activity at issue. *Id.* (internal citations omitted).

18      Given that WNBA is a league of individually owned franchises, *Global Horizons* must be

19  read in tandem with this circuit's test for joint employer relationships in the franchise context. As

20  the Ninth Circuit stated in *Salazar v. McDonald's Corp.*, 944 F.3d 1024, 1032 (9th Cir. 2019), to

21  establish an employment relationship, the franchisor "must retain or assume a general right of

22  control over factors such as hiring, direction, supervision, discharge, and relevant day-to-day

23  aspects of the workplace behavior of the franchisee's employees."

24      Although the court of appeals has not squarely applied the joint test to a professional sports

25  league, the lower court opinion in *Senne v. Kansas City Royals Baseball Corp*., 591 F. Supp. 36

26  453 (N.D. Cal. 2022) analyzed the question in the context of minor league baseball. In *Senne*, the

27  magistrate judge discussed in extensive detail whether Major League Baseball ("MLB") is a joint

28  employer of its minor league players. Although *Senne* arises in the content of the Fair Labor

1  Standards Act ("FLSA"), where the test of joint employer is the "economic reality test," as *Global*

2  *Horizons* observes, there "may be little functional difference" between the various frameworks

3  for evaluating joint employer status: "All three are fact-intensive tests that will usually produce

4  the same outcome in a joint employment analysis." *Global Horizons*, 915 F.3d at 639.

5      Judge Spero in *Senne* meticulously applied the four core factors of the economic reality

6  test: whether the putative employer "'(1) had the power to hire and fire the employees; (2)

7  supervised and controlled employee work schedules or conditions of employment; (3) determined

8  the rate and method of payment, and (4) maintained employment records.'" *Senne*, 591 F.Supp.3d

9  at 511. (quoting *Bonnette v. Cal. Health and Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983).

10 The court concluded that each criterion weighed in favor of joint employer status for MLB. First,

11 the court found that MLB's direction of the college draft for entry level baseball players is the

12 "sort of control over hiring that supports a finding…that an entity is a joint employer." *Senne*, 591

13 F.Supp.3d at 518. The court then observed that the Major League Commissioner retains authority

14 to ban players for disciplinary reasons. *Id.*

15     Turning to the second factor, the court found that while individual teams direct players on

16 a daily basis, the league's imposition of some uniform contractual standards and disciplinary

17 guidelines for on and off field conduct amounts to at least supervision of employment. *Id.* at 521-

18 22. As to the third factor, the court noted that MLB exercises considerable oversight of the salary

19 structure, including setting a uniform first year salary, and minimum salary rates for non-rookies.

20 *Id.* at 525. Finally, the judge determined that the fourth factor favors joint employer status because

21 MLB maintains certain player personnel records. *Id.* at 527.

22     As Judge Spero observed, while there is no "firmly establish[ed] rule that sports leagues

23 are joint employers of players who play for the affiliate members of a league", resolution of the

24 issue "depends on the specific facts regarding the relationship between the players and league."

25 *Id.* at 512.

26     Applying this circuit's authority and the persuasive reasoning in *Senne*, the extent of

27 control factors are satisfied. In her Complaint, Hamby pleads the following facts that infer a joint

28

employer relationship between WNBA[12] and the Defendant Las Vegas Aces: "Defendant Las Vegas Aces is a franchise operation governed by the rules and regulations of the Defendant WNBA, thereby making the Defendant WNBA and the Defendant Las Vegas Aces joint employers of Plaintiff Hamby." ECF No.1 ¶ 13; that on January 21, 2023, the Executive Director of the WNBA Players' Association directed her request on Hamby's behalf for an investigation into Hamby's public allegations of discrimination not to the Las Vegas Aces, but WNBA. *Id. at* ¶ 51; that WNBA exercised the authority to conduct some level of inquiry into Hamby's claims; *Id.* at ¶ 52; that the WNBA issued findings with respect to Hamby's allegations, including a determination that the WNBA's "Respect in the Workplace Policy" was violated *Id.* at ¶ 56-57; that WNBA has promulgated a policy that sets uniform standards for the treatment of athletes *Id.*; and that WNBA is empowered to disapprove trades of players between teams *Id.* at ¶ 57. This combination of non-conclusory allegations about the scope of WNBA's authority over the employment relationship between players and its franchises plausibly satisfies this circuit's extent of control test under the *Iqbal*/*Twombly* standard and provides fair notice of the contours of Hamby's joint employment claim.

Should the Court determine additional facts are warranted, the Court has discretion to grant leave to file an Amended Complaint. *See, e.g. Moss v. U.S. Secret Serv.*, 572 F.3d 962, 972 (9th Cir. 2009) ("Dismissal without leave to amend is improper unless it is clear… that the complaint could not be saved by any amendment.") (citing *Gompper v. VISX, Inc.*, 298 F.3d 893, 898 (9th Cir.2002). Hamby therefore requests leave to file an Amended Complaint to add the following additional allegations:

"14.    WNBA has entered a collective bargaining agreement ("CBA") that creates contractual rights for the league's athletes that transcend team lines, and the CBA is binding on each privately owned franchise that is a WNBA team.

15.    The features of the CBA include a universal rule structure that regulates for all

---

[1] There is no dispute that WNBA is an employer subject to Title VII, 42 U.S.C. § 2000e et seq. as and NRS 613.630.

1    teams the terms of the free agent system, minimum and maximum permissible compensation, and

2    respective tiers of compensation for players who perform at certain levels of achievement.  In

3    addition, the CBA augments team bargained individual contracts with the availability of

4    performance based bonuses and marketing deals that are paid by the league; and the provision of

5    league based benefits such as health insurance, retirement plans; and childcare.

6          16.     The CBA affects every player's employment status through the following reserved

7    authority: (a) the power to impose discipline on players with fines and suspensions, up to and

8    including authority to ban a player for egregious misconduct; (b) control over the annual draft

9    process by which teams supplement the roster with college talent; (c) provision of health insurance

10   and retirement benefits through league purchased plans; (d) ultimate approval authority over

11   trades, including the express right to rescind trades; and (e) discretion to investigate discrete

12   employment acts that violate league adopted rules."

13         The proposed amendment clarifies the pervasive reach of the league's CBA, which

14   provides the parameters of every one of its athletes' terms and conditions of employment. The

15   core economic relationships between players and their teams are shaped by baselines and tiers for

16   compensation as defined by WNBA. *See* Proposed First Amended Complaint at ¶ 15, attached as

17   Exhibit "A." The mobility of athletes at the conclusion of their contracts occurs within a league-

18   defined free agency structure. *Id*. The league, rather than individual teams, provides and defines

19   the scope of benefits. *Id*. The league directly compensates players through performance-based

20   cash incentives. *Id*. And, as noted in the Proposed Amended Complaint and the existing

21   Complaint, discipline is a league-wide enterprise regulated by the CBA. *Id*. at ¶ 16; ECF No. 1 ¶¶

22   56, 57.

23         In its bid to counter a finding of joint employer liability, WNBA points, first, to *Chapman*

24   *v. Las Vegas Basketball, L.P.*, 2024 WL 3823271 at *3 (D. Nev. Aug. 14, 2024) (Gordon, J),

25   where this Court dismissed a joint employer theory by an "events worker" alleging wage

26   violations by the Aces and a variety of entertainment entities under the Fair Labor Standards Act

27   ("FLSA") and Nevada's state wage statutes. But Hamby's existing complaint contains much more

28   factually robust material than the conclusory allegations of joint ownership in *Chapman*. *Id*. And

1   this Court, even with a dearth of any pleaded support for a finding of joint ownership, nonetheless

2   granted leave to the Plaintiff to amend the Complaint, just as Hamby seeks to do. *Id.* At no point

3   did this Court signal how it would regard the substance of a joint employer claim in the context

4   of a professional sports league.

5        WNBA then offers the Ninth Circuit's consideration in *Dawson v. National Collegiate*

6   *Athletic Association ("NCAA"), et al.*, 932 F.3d 905 (9th Cir. 2019), of a student athlete's claim

7   asserting that the NCAA and the PAC-12 Conference were joint employers. But *Dawson* is

8   fundamentally distinguishable.[3] The appeals court held in *Dawson* that neither the NCAA nor the

9   PAC-12 qualified as an employer of the plaintiff student athlete: "They do not admit to the school

10  or pick him for the team; they do not remove him from the team; they do not supervise his

11  schedules or activities in practices or games; they do not maintain his scholastic records; and

12  although they put caps on what he may receive as a scholarship, they do not determine whether

13  he gets a scholarship or in what amount." *Id.*, 932 F.3d at 911.

14       WNBA does not maintain the arm's length from its athletes in the manner of college sports

15  associations. To the contrary, WNBA entered a CBA with the players union and wove an entire

16  regulatory network for the terms and conditions of employment that has no comparison to amateur

17  sports. Nor, in contrast to the NCAA and its (semi)regional conferences, is the WNBA a mere

18  "regulatory bod[y])." *Id.* WNBA's CBA goes well beyond regulating competition and sets the

19  boundaries of compensation, dictates the rules of the market for player mobility, and directly

20  confers extra compensation and benefits to players. *Supra* at 4.

21       WNBA also relies on more traditional franchisor cases that rejected a joint employer

22  relationship in the context of employment discrimination claims. But neither of the unpublished

23  opinions WNBA invokes offer genuine support for its position. Both *Stewart v. Chick-fil-A*, 2020

24  WL 264578 at *2 (S.D. Cal. Jan. 17, 2020) and *Courtland v. GCEP-Surprise, LLC*, 2013 WL

---

[3] *Dawson* is also an FLSA case. The circuit court in *Global Horizons* explicitly declined to adopt for Title VII cases the "economic reality" test for joint employer status that governs FLSA cases, opting for the aforementioned extent of control test. *Global Horizons*, 915 F.3d at 638-39. But as noted below, this circuit has treated the various iterations of the joint employer test as functionally similar in scope. *Id*. at 639.

1    3894981 at *3-5 (D. Ariz. July 29, 2013) involve fast food franchises. It is axiomatic that the

2    owners of local stores operate with a level of daily autonomy from their parent companies in

3    virtually every aspect of the employment relationship. *Id*. Invariably, casual restaurant franchises

4    are not unionized, and consequently their workers are not protected by the overarching framework

5    of a collective bargaining agreement.

6          Hamby has identified in her complaint that the theory of liability for WNBA rests on a

7    joint employer relationship, and she asserts in her original pleading and in her proposed

8    amendment factual material that provides a plausible foundation for her joint employer theory.

9    **C. The Failure to Investigate Claim**

10          Turning to the merits of Hamby's retaliation claim against WNBA, she first argues that

11    the league's apparent failure to investigate her pregnancy discrimination claim violates the

12    retaliation clause of Title VII. WNBA disputes that such a claim is viable on the grounds that it

13    does not establish an adverse action, but the league manages to avoid any reference to the proper

14    standard for evaluating what constitutes an adverse action for purposes of a retaliation claim. As

15    the Ninth Circuit has observed, "Title VII retaliation claims may be brought against a much wider

16    range of employer conduct than substantive claims of discrimination." *Campbell v. Hawaii*

17    *Department of Education*, 892 F.3d 1005, 1021 (9th Cir. 2018). "Namely, a Title VII retaliation

18    claim need not be supported by an adverse action that materially altered the terms and conditions

19    of the Plaintiff's employment; instead an allegedly retaliatory action is subject to challenge so

20    long as the plaintiff can show that 'a reasonable employee would have found the challenged action

21    materially adverse, which in this context means it well might have dissuaded a reasonable worker

22    from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington Northern &*

23    *Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006).

24          The Ninth Circuit has not to date addressed whether a failure to investigate a claim of

25    discrimination constitutes the kind of dissuasive conduct that constitutes an adverse action for

26    Title VII purposes. WNBA cites a series of unpublished district court opinions that rejected claims

27    based on a failure to investigate. On closer scrutiny, the trend in those cases is less conclusive

28    than WNBA makes it out to be.

1    Only one of WNBA's cases categorically rejects a failure to investigate retaliation claim.

2  *See Chesley v. City of Mesquite*, 2023 WL 5206925 at *5 (D. Nev. Aug. 14, 2023). Another

3   addresses a failure to investigate claim solely in the context of the traditionally more restrictive

4  disparate treatment claim, which requires an alteration in the terms and conditions of employment.

5  *See Kurdi v. California Department of Transportation*, 2023 WL 267538 at *7) (E.D. Cal. Jan.

6  18, 2023).

7    But two of the cases WNBA cites actually recognize that a retaliatory failure to investigate

8  claim is viable under some set of facts. In *McAlister v. Adecco U.S.A. Inc.*, 2018 WL 6112956 at

9  *9 (D. Haw. November 21, 2018), the district court found that the plaintiff who complained of

10  discrimination could not sustain a retaliation claim based solely on an employer "not investigating

11  those very same complaints." But as the district court elaborated, a claim could be cognizable if

12  the failure to investigate is in retaliation for some separate, protected act by the plaintiff.'" *Id*.

13  (internal citation omitted). Hamby's claim would survive under that rationale, as she alleges in

14  her complaint that her predicate protected activity was not the January 23, 2023 complaint the

15  player's union initiated on her behalf but her public Instagram posting two days earlier. Judge

16  Navarro in this jurisdiction reached a similar conclusion in *Doe No. 1 v. Wynn Resorts, Limited*,

17  2023 WL 1782439 at *16 (D. Nev. Feb. 3, 2023) (the "failure to investigate could constitute an

18  adverse employment action if the failure was in retaliation for a separate protected act.").

19    In addition, because the Ninth Circuit construes retaliation claims more permissively

20  than their disparate treatment counterparts, s*ee Campbell*, 892 F.3d at 1021, the Supreme Court's

21  holding in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) may have consequences for Hamby's

22  claim. *Muldrow* lessens the standard for disparate treatment adverse action to a showing of "some

23  harm respecting an identifiable term or condition of employment," as opposed to a "heightened

24  bar" that requires "serious" or "substantial" injury. *Id*. at 355. This circuit, in order to harmonize

25  its rule that retaliation claims should be construed more expansively than discrimination claims

26  with *Muldrow*, may yet revisit the retaliation standard in a manner that affects the viability of

27  Hamby's failure to investigate claim.

28    In its briefing, WNBA provides no rationale for why an employer's refusal to investigate

1  a complaint is not the prototype of dissuasion to engage in protected activity. While some courts

2  have reasoned that a plaintiff is left no worse off by a failure to investigate, and therefore suffers

3  no impact, dissuasive or otherwise, *see Fincher v. Depository Trust and Clearing Corp*., 604 F.3d

4  712, 722 (2d. Cir. 2010), Hamby was left in a worse place by the league's inaction. At minimum,

5  the trade could have been rescinded by the league.

6       Hamby's theory of liability for WNBA based on a failure to investigate is not foreclosed

7  by circuit precedent and some district courts within this circuit have approved the theory in certain

8  contexts. As a result, the claim is not lacking in plausibility, which is the sole inquiry for the Court

9  at this preliminary stage. WNBA's motion to dismiss the retaliation count is therefore due to be

10  denied.

11  **D.  Non-Renewal of Hamby's Marketing Contract**

12       **1.  Exhaustion of EEOC Administrative Remedies**

13       Hamby asserts an additional theory of retaliatory conduct by WNBA based on the league's

14  failure to renew her marketing and promotional contract subsequent to the filing of her EEOC

15  charges. WNBA first contends that any claim based on the non-renewal of the contract is barred

16  because Hamby did not exhaust her administrative remedies by amending her charge, or filing a

17  new charge, based on the incident.

18       In determining whether an employee has administratively exhausted claims under Title

19  VII, courts in this jurisdiction evaluate whether allegations in the Plaintiff's complaint are "like

20  or reasonably related to the allegations in the EEOC complaint, such that they would fall "within

21  the scope of an EEOC investigation [that could] reasonably be expected to grow out of the

22  …charge of discrimination." *Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir. 1990) (citations and

23  quotations omitted). The scope of charge analysis applies not just to alleged claims pre-charge

24  that the plaintiff seeks to allege post-lawsuit, but to claims that arise out of post-charge conduct.

25  *Id.* at 1457. The judicial analysis has honed in on whether the charge's identified theory of liability

26  captured the category of unmentioned conduct the plaintiff seeks to invoke in a lawsuit. *See Leong*

27  *v. Potter*, 347 F.3d 1117, 1122 (9th Cir. 2003); *B.K.B. v. Maui Police Department*, 276 F.3d

28  1091,1100 (9th Cir. 2002).

Hamby's original charge and amended charge allege that WNBA acted in a punitive manner towards her because of her public comments on Instagram in the immediate aftermath of learning of her trade. A reasonable EEOC investigation pursuing the retaliation theory would have readily determined that when the league had an opportunity to continue its promotional relationship with Hamby, it declined to do so, and that the decision was made in close proximity to the filing of the charge. While the nature of the second alleged act of retaliation differed from the first occurrence, it is well within the ambit of the retaliation theory asserted in the charges. Furthermore, the charges describe a succession of continuing reprisals over the course of the past year, ranging from the Aces' inquiry into Hamby's OBGYN records to the more recent fact she was not invited to the Aces' championship celebration at the White House. While those acts were committed by the Aces and not WNBA, the EEOC could have been expected to delve into whether Hamby continued to face negative consequences, which would have easily uncovered the non-renewal of the marketing deal; and whether the filing of the charge inspired new retaliatory conduct in its own right.

When courts in this circuit have declined to find post-charge retaliation claims were exhausted, the underlying charges often did not allege retaliation at all. *See Vazquez v. County of Los Angeles*, 349 F.3d 634, 645 (2003).  Indeed, some cases have construed post charge retaliation to reasonably arise out of charges invoking substantive discrimination when the plaintiff's charge checked the continuing action label, as Hamby's did. *See Vasquez v. Piper Sandler and Company*, 2024 WL 43664147 at *11) (D. Ariz. Sept. 30, 2024); *Ware v. NBC Nevada Merchants, Inc*., 219 F.Supp.3d 1040, 1049 (D. Nev. 2016). Courts have also held that a reasonably comprehensive EEOC inquiry into retaliation would discover the larger gamut of retaliatory acts. *Sosa*, 920 F.2d at 1457; *Pratt v. Hawaii Department of Public Safety*, 308 F.Supp.3d 1131, 1145-46 (2018).

Given this circuit's lenient construction of the EEOC exhaustion requirement, Hamby's allegations that the non-renewal of her marketing contract with WNBA was reasonably related to her charge of retaliation against the league, and Hamby adequately exhausted her administrative remedies.

///

### 2. Retaliatory Conduct Outside the Scope of Employment

Next, WNBA argues at some length that the marketing agreement is outside the reach of Title VII because it involves a temporary independent contractor status between Hamby and the league rather than an employment relationship. But WNBA overlooks that the Supreme Court has addressed the issue of whether the retaliation clause of Title VII can be read solely to reach conduct that affects the terms of employment or more broadly reaches conduct outside the course of employment. In *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53 at 63, the Court determined that "[a]n employer can effectively retaliate against an employee by taking actions not directly related to [her] employment or causing [her] harm outside the workplace…A provision limited to employment-related actions would not deter the many forms that effective retaliation can take." *See also Arias v. Raimondo*, 860 F.3d 1185, 1190 (9th Cir. 2017) (applying *Burlington Northern* to permit retaliation claims that are not "related to employment" or that do not "occur at the workplace.").

For example, an employer could accomplish the unlawful retaliatory aim of deterring protected activity by proactively withdrawing opportunities for development outside the workplace. *See Hughes v. Pacific University,* 2023 WL 7497106 at *16 (D. Oreg. Nov. 13, 2023) (treating denial of professional development funds as a viable theory of adverse action for retaliation purposes). WNBA's failure to extend Hamby's marketing deal is precisely the kind of conduct outside the corners of the workplace that Burlington Northern contemplates as prohibited retaliation.

### 3. Temporal Proximity Between Nonrenewal of the Marketing Contract and Protected Activity

Retaliation claims require ultimate proof that an employer's challenged actions are driven by a retaliatory purpose. *Opara v. Yellen*, 57 F.4th 709, 723 (9th Cir. 2023). At the motion to dismiss stage, an employment discrimination litigant need not plead a prima facie case of liability, as she must eventually assert at the summary judgment phase. *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 514 (2006). But to survive a dismissal motion, a plaintiff must plead "enough factual content to justify the reasonable inference the defendant is liable for the misconduct alleged."

1    *EEOC v. Tesla, Inc*., 2024 WL 1354530 at * 5 (N.D. Cal. Mar. 29, 2024) (citing *Iqbal*, 556 U.S.

2    at 678 (2006)). Plaintiffs may rely at the 12(b)(6) stage on evidence of a close temporal proximity

3    between adverse action and complaints of discrimination to satisfy the requisite inference of

4    retaliatory intent. *See Moreno v. City of Porterville*, 2024 WL 4347302 at *8 (E.D. Cal. September

5    30, 2024).

6         WNBA argues that Hamby cannot establish a sufficient temporal connection between her

7    protected activity and the termination of her marketing contract to infer retaliation was at work.[4]

8    To make its point, WNBA uses as its frame of reference the January 2023 complaint to the league

9    and the non-renewal in October 2023.

10        WNBA simply overlooks the pleaded facts that approximately a month before the October

11   failure to extend the marketing contract, Hamby engaged in additional protected activity by filing

12   her charge against the Aces and the league (which she amended nine days before the contract

13   lapsed). The EEOC is required by statute to serve notice of the charge, including the date, place,

14   and circumstances of the alleged unlawful employment practice, on the Respondent, in this case,

15   the WNBA, within ten days of its filing. 42 U.S.C.A. § 2000e-5(e)(1). Thus, the WNBA is

16   presumed to have received notice of the charge no later than October 2, 2023, ten days after the

17   charge was filed. This circuit has regularly treated gaps of up to one month or less between

18   complaint and employment action as potentially sufficient to support evidence of retaliatory

19   intent. S*ee Ray v. Henderson*, 217 F.3d 1234, 1238-39, 1244 (9th Cir. 2000). *See also McIntosh

20   v. City of North Las Vegas*, 2023 WL 4868404 at *9 (D. Nev. July 28, 2023) (Gordon, J.); *Okeke

21   v. Biomat U.S.A*., *Inc*., 927 F. Supp. 2d 1021, 1026 (D. Nev. 2013).

22        Even if the Court were inclined to view Hamby's January 2023 protected activity as a

23   baseline, this circuit has found that the absence of temporal proximity evidence does not

24   necessarily defeat an inference of causation when the alleged retaliator did not have an earlier

25   opportunity to act more expeditiously. *See Porter v. Cal. Department of Corrections*, 419 F.3d

26

27   _____

28   [4] WNBA incorrectly couches its arguments in terms of the prima facie requirement of causality, which as noted above, is inapplicable at this stage of litigation.

1    885, 895 (9th Cir. 2005); *Oden Myers v. Kendall*, 2024 WL 3743694 at *12 (C.D. Cal. June 3,

2    2024); *Pringle v. Wheeler,* 478 F.Supp.3d 899, 918 (N.D. Cal. 2020).  Here, the expiration of

3    Hamby's year-long contract in October 2023 plausibly marked the WNBA's first opportunity to

4    begin to limit her exposure and marketing opportunities post-protected activity. Given the

5    combination of first opportunity evidence and the relatively close link in time between Hamby's

6    EEOC activity and the league's decision not to renew her contract, she has established the

7    requisite evidence of retaliation for her claim based on the contract to proceed to discovery.

8        **E.  Retaliation Under Nevada Law for Post-Trade Retaliatory Acts**

9            WNBA asks this Court to dismiss Hamby's retaliation claims under Nevada law because

10    its alleged retaliation occurred after the Las Vegas Aces traded her to the Los Angeles Sparks.

11    WNBA argues that the text of Nevada's discrimination and retaliation laws, including NRS

12    613.340, preclude coverage of claims related to employment outside this state. ECF No. 14 at p.

13    17, citing NRS 613.320(a).

14            But WNBA overlooks that this Court has determined that Nevada courts permit the claim

15    of post-employment retaliation. *See*, *Bunar v. Aliante Gaming, LLC*, 2017 WL 3469271, at *3 (D.

16    Nev. Aug. 10, 2017) (finding that an employer opposing an employee's entitlement to post-

17    termination unemployment benefits could form the basis of a Nevada state law retaliation claim

18    if the opposition was done in retaliation for the plaintiff's protected activity). It would be contrary

19    to the doctrine of post-employment retaliation to cut off liability the moment an employee

20    relocates to another state, and the state legislature has pointedly not written such an arbitrary

21    limitation into the statute.  The effect would be particularly perverse on the facts in this case, when

22    Hamby's relocation was the product of an unlawful trade across state lines.

23            More fundamentally, WNBA's alleged acts of retaliation arise out of Hamby's

24    employment in Nevada; the underlying discriminatory and initial retaliatory acts on the part of the

25    Las Vegas Aces occurred during Hamby's residence in Nevada; the retaliatory acts she alleges

26    flow directly from Hamby's employment in the State of Nevada; the WNBA's deficient

27    investigation, which forms the basis for one of her claims against the league, was partly conducted

28    in Nevada and solely involved a Nevada employer and its Nevada based agents. As a result, NRS

613.320(a)'s purpose of protecting employees performing work for Nevada employers would be undercut if the statute were read to preclude a claim that has such a factual nexus to the state. Finally, it would run counter to the principle that NRS Chapter 613 and Title VII are coextensive, *see Crawford v. Nevada Department of Transportation*, 2019 WL 1442178 at *4, n.2 (D. Nev. Mar. 31, 2019), to construe a limiting principle on the reach of Nevada based retaliation claims that does not exist in Title VII doctrine. Tellingly, WNBA does not raise, or even hint, at a challenge to this Court's jurisdiction to hear the Title VII claim against the league. Accordingly, Hamby's Nevada claims should not be dismissed.

**IV.    COUNTERMOTION FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT**

**A.    Legal Standard**

Even if Hamby's Complaint is deficient, which it is not, the Court should grant Plaintiff leave to amend her Complaint. "A district court shall grant leave to amend freely 'when justice so requires.' We have stated that 'this policy is to be applied with extreme liberality.' In determining whether leave to amend is appropriate, the district court considers 'the presence of any of four factors: bad faith, undue delay, prejudice to the opposing party, and/or futility.'" *Owens v. Kaiser Found. Health Plan, Inc*., 244 F.3d 708, 712 (9th Cir. 2001). All factors weigh in favor of granting Hamby leave to amend to file her Proposed First Amended Complaint. Ex. A.

First, there is no bad faith on the part of Hamby as she has alleged sufficient facts to provide adequate notice to WNBA of the claims against it. Granting Hamby leave to amend would not introduce any opportunity for bad faith as Hamby would only be adding the additional facts outlined in Exhibit A within a designated timeframe as directed by the Court. Second, there would be no undue delay by allowing Hamby to amend her complaint. Any slight delay caused by permitting a First Amended Complaint to be filed would be minimal. The parties have not yet had their Rule 26(f) Scheduling Conference and discovery has not commenced. As such, the deadline to amend pleadings and add parties is still to be determined. Therefore, this request is timely and there has been no undue delay.

Third, WNBA would not suffer any prejudice by granting Plaintiff leave to amend to assert additional facts. The case is in its early stages and no discovery plan and scheduling order has

1    been entered. The WNBA will suffer no prejudice with an amendment at this early stage, and

2    Hamby's interest in having her claims proceed on the merits outweighs any potential prejudice to

3    WNBA in any event.

4           Finally, amendment would not be futile. WNBA does not argue that no set of facts could

5    entitle Hamby to the relief she is seeking. Instead, WNBA's arguments are premised upon

6    Hamby's alleged failure to plead sufficient facts to sustain a claim. For these reasons, if this Court

7    does not deny WNBA's motion entirely, it should grant Hamby leave to amend to cure any

8    deficiencies in her Complaint.

9           With all factors weighing in favor of granting Hamby leave to amend, even if Hamby's

10   Complaint is deficient, which she submits it is not, then she should be granted leave to file the

11   Proposed First Amended Complaint, Exhibit A, in lieu of dismissal with prejudice.

12   **V.   <u>CONCLUSION</u>**

13          WNBA's efforts to escape liability for its alleged retaliation toward Hamby fails. The

14   Court should permit the amendment of the Complaint to allow elaboration of evidence to support

15   her theory that WNBA was her joint employer and evaluate the claim in light of that evidence.

16   Her claims on the merits state plausible theories of liability. Therefore, the WNBA's motion to

17   dismiss is due to be denied.

18                    Respectfully Submitted this 16th day of October 2024.

19                                        **HKM EMPLOYMENT ATTORNEYS LLP**

20                                        <u>/s/ Dana Sniegocki</u>
                                          **Dana Sniegocki, Esq.**
21                                        Nevada Bar No. 11715
                                          E-mail: dsniegocki@hkm.com
22                                        **Erin S. Norgaard, Esq.**
                                          Washington Bar No. 32789 (*Admitted Pro Hac Vice*)
23                                        E-mail: enorgaard@hkm.com
                                          **Artur Davis, Esq.**
24                                        Alabama Bar No. 3672D-56A (*Admitted Pro Hac Vice*)
                                          Email: adavis@hkm.com
25                                        101 Convention Center Dr., Suite 600
                                          Las Vegas, Nevada 89109
26                                        Tel: (702) 577-3029
                                          Fax: (702) 577-3029
27

28

*Attorneys for Plaintiff*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of October 2024, I caused to be served a true and correct copy of the foregoing **PLAINTIFF'S OPPOSITION TO DEFENDANT WNBA LLC'S MOTION TO DISMISS (ECF NO. 14) AND COUNTERMOTION FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT** on the following persons as follows:

\_\_\_\_\_         by placing the same for mailing in the United States Mail, in a sealed envelope on which first class postage was prepaid in Las Vegas, Nevada and/or

\_\_X\_\_         to be sent via electronic filing with the Clerk of the Court using the Court's electronic filing system and serving all parties with an email address of record who have agreed to receive Electronic Service in this action

\_\_\_\_\_         to be hand delivered to the persons and/or addresses below:

*/s/ Rex Martinez*
An Employee of HKM EMPLOYMENT ATTORNEYS LLP