# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| DEARICA HAMBY,<br><br>     Plaintiff<br>v.<br><br><br>WNBA, LLC et al.,<br><br>     Defendants | Case No.: 2:24-cv-01474-APG-DJA<br><br>**Order (1) Granting in Part Defendant Las Vegas Basketball L.P.'s Motion to Dismiss; (2) Granting Defendant WNBA, LLC's Motion to Dismiss; (3) Denying Plaintiff Dearica Hamby's Motion for Leave to Amend Complaint; and (4) Denying Motion for Leave to File Brief as Amici**<br><br>[ECF Nos. 12, 14, 32, 34] |

Plaintiff Dearica Hamby sues her former employer, Las Vegas Basketball L.P. (the Las Vegas Aces), under Title VII and Nevada Revised Statutes (NRS) §§ 613.330 and 613.340 for sex discrimination based on pregnancy and retaliation. She also sues WNBA, LLC, which operates the Women's National Basketball Association (WNBA), for retaliation under Title VII and NRS § 613.340. She alleges the Aces were unlawfully motivated by her pregnancy to trade her to the Los Angeles Sparks, and that both defendants retaliated against her after she publicly alleged on her social media account that the Aces had discriminated against her.

Both the Aces and the WNBA move to dismiss Hamby's claims on a variety of grounds. Hamby opposes dismissal and requests leave to amend. Additionally, non-parties Public Justice, A Better Balance, and the National Employment Law Project move for leave to file an amicus brief.

I deny the Aces' motion to dismiss Hamby's discrimination claims because she has sufficiently pleaded them. I grant in part the Aces' motion and dismiss Hamby's retaliation claim based on the allegations that (1) the Aces instructed Aces players and staff to not speak to

Hamby; (2) the Aces attempted to get access to Hamby's medical records after informing her of the trade; and (3) in a public radio interview, Aces general manager Natalie Williams incorrectly implied that Hamby was aware of her pregnancy in June 2022.  Hamby has not plausibly alleged a causal link between these alleged retaliatory actions and her protected activity.  I deny the motion to dismiss Hamby's retaliation claim based on her allegations that (1) the Aces did not invite her to a White House visit celebrating the Aces' first WNBA championship, and (2) the Aces prohibited its videography staff from projecting Hamby's daughter on the video screen at an Aces game.

I grant the WNBA's motion to dismiss Hamby's retaliation claim based on her allegation that the WNBA failed to properly investigate and remediate her allegations of discrimination against the Aces because Hamby has not plausibly alleged that she was subjected to an adverse employment action.  I also grant the WNBA's motion to dismiss the retaliation claim based on Hamby's allegation that the WNBA did not renew her marketing contract because she has not plausibly alleged that she exhausted her administrative remedies and the deadline to amend or file a charge based on this allegation has passed.  Because amendment would be futile for Hamby's retaliation claims against the WNBA, I dismiss them with prejudice and deny as moot her motion for leave to file the proposed amended complaint.  Accordingly, I also deny the motion for leave to file a brief as amici because potential amici address arguments pertinent only to Hamby's claims against the WNBA.

## I.    BACKGROUND

Hamby alleges the following facts, which I accept as true when resolving the motions to dismiss.  Hamby began her career as a WNBA player in 2015 when she was drafted by the San Antonio Stars, which later became the Las Vegas Aces. ECF No. 1 at 3-4.  Between 2018 and

2024, Hamby and the Aces won their first WNBA championship; and Hamby twice won the WNBA Sixth Woman of the Year award, participated in multiple WNBA All-Star games, and was a member of USA Basketball's 3x3 Women's National Team in the 2024 Paris Olympics. *Id.* at 4.

In June 2022, Hamby signed a two-year contract extension to continue playing for the Aces until May 2025. *Id.* at 4-5.  To incentivize Hamby to sign the extension, the Aces offered Hamby benefits outside the contract terms, including paying for her daughter's private school tuition and allowing Hamby to use Aces housing. *Id.* at 5.  Approximately three weeks after she signed the contract extension, Hamby discovered she was pregnant, and in August 2022 she informed Aces head coach Becky Hammon, as well as other coaching and training staff, of her pregnancy. *Id.*  After Hamby's doctor confirmed her pregnancy two days later, she notified Aces general manager Natalie Williams. *Id.* at 5-6.  In September 2022, Hamby publicly announced her pregnancy to fans and the media, following which she experienced notable changes in treatment by the Aces, including Williams and Aces President Nikki Fargas not giving her a specific date as to when they would pay for her daughter's tuition, and Williams telling Hamby to vacate the team housing without giving her a reason why. *Id.* at 6.

During a phone call on January 15, 2023, Hammon asked Hamby if she had planned her pregnancy, and when Hamby responded no, Hammon told Hamby she was "not taking proper precautions not to get pregnant." *Id.* at 7.  Hammon also "questioned Hamby's commitment and dedication to the team." *Id.*  She stated that Hamby would not be ready in time to play at the start of the following season and accused her of signing the contract extension while knowing she was pregnant. *Id.*  Hammon said that Aces staff believed Hamby would get pregnant a third time, "accused Hamby of not taking her off-season workouts seriously," and said that Hamby "did not

hold up her end of the bargain and that no one expected her to get pregnant again." *Id.*  Hamby denied these accusations. *Id.*  On the same call, Hamby asked Hammon, "'You're trading me because I'm pregnant?'" *Id.* at 8.  To this, Hammon responded, "'[W]hat do you want me to do?'" *Id.*  Hammon did not deny that the Aces were trading Hamby because she was pregnant. *Id.*  The next day, Hammon called Hamby and said, "'[her] time with the Aces [was] up,'" and informed her that she was being traded to another team. *Id.*

On January 21, 2023, the Aces issued a public announcement that they had traded Hamby to the Los Angeles Sparks. *Id.*  On the same day, Hamby released a public statement on her social media that alleged the Aces had discriminated against her because of her pregnancy. *Id.* Two days later, the executive director of the WNBA Player's Association, Terri Jackson, sent an email to the WNBA's general counsel to request that the WNBA investigate Hamby's allegations of discrimination. *Id.* at 8-9.

In early February 2023, the Aces announced on their official X social media account that the WNBA had launched a formal investigation into Hamby's allegations. *Id.* at 9.  In April 2023, after giving birth to her son, Hamby reported to training camp for the Sparks, "did not miss any required time . . . as a result of her pregnancy," and played in all 40 regular season games with the Sparks. *Id.*

In May 2023, the WNBA released a public announcement that it had finished its investigation and was rescinding the Aces' 2025 first-round draft pick for "violating league rules regarding impermissible player benefits" as well as suspending Hammon for two games without pay for "violating league and team Respect in the Workplace policies." *Id.*  Otherwise, the WNBA "provided no meaningful redress to . . . Hamby for the harm she suffered as the victim of the violations found by the WNBA, such as disapproving her trade to the Los Angeles Sparks,

though it was empowered to do so." *Id.* at 10.  In conducting its investigation, the WNBA did not interview any Aces players who could have corroborated Hamby's allegations, and, according to Hamby, the WNBA did not adequately punish the Aces or Hammon for their alleged discriminatory acts. *Id.*  As a result of the trade, Hamby was moved to "a less competitive team [which] resulted in a loss of reputational prestige and brand value," as well as a loss of marketing and endorsement opportunities associated with the Las Vegas sports market. *Id.* at 10-11.

Although the complaint is not clear about when certain events occurred, it alleges that at some point after Hamby's January 21 social media post, the Aces and WNBA took retaliatory actions against her.  Hamby states (1) the Aces prohibited its players and staff from communicating with her, (2) its general manager falsely implied on a public radio interview that Hamby and the Aces were aware of Hamby's pregnancy since June 2022, (3) the Aces attempted to obtain confidential medical records from Hamby after informing her of the trade, (4) the Aces did not invite Hamby to attend a White House ceremony with then-Vice President Kamala Harris to celebrate the Aces' first WNBA championship, and (5) the Aces prohibited video personnel at a September 17, 2023 Aces game from displaying Hamby's daughter on the video screen. *Id.* at 11.  The WNBA declined to extend Hamby's WNBA League marketing contract, under which she performed marketing work in exchange for compensation outside her player contract. *Id.* at 11-12.

## II.   ANALYSIS

In considering a motion to dismiss under Rule 12(b)(6), I take all well-pleaded allegations of material fact as true and interpret the allegations in a light most favorable to the non-moving party. *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017).  However, I do not "assume the truth of legal conclusions merely because they are cast in the form of factual

allegations." *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1163 (9th Cir. 2017). To

defeat a motion to dismiss, a plaintiff must make sufficient factual allegations to establish a

plausible entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009). Such allegations must amount to "more than labels and conclusions,

[or] a formulaic recitation of the elements of a cause of action." *Id.*

**A. The Aces**

    **a. Discrimination**

Title VII prohibits discrimination based on sex. *Young v. United Parcel Serv., Inc.*, 575

U.S. 206, 212 (2015). The Pregnancy Discrimination Act expanded Title VII protections to

discrimination "because of or on the basis of pregnancy, childbirth, or related medical

conditions." 42 U.S.C. § 2000e(k); *Young*, 575 U.S. at 212. The Pregnancy Discrimination Act

requires employers to treat "women affected by pregnancy . . . the same for all employment-

related purposes . . . as other persons not so affected but similar in their ability or inability to

work . . . ." 42 U.S.C. § 2000e(k). In Nevada, discrimination claims brought under NRS

§ 613.330 are analyzed under the same principles as Title VII discrimination claims. *Pope v.*

*Motel 6*, 114 P.3d 277, 280 (Nev. 2005).

"To establish a *prima facie* case of disparate treatment under Title VII, a plaintiff must

offer proof: (1) that the plaintiff belongs to a class of persons protected by Title VII; (2) that the

plaintiff performed his or her job satisfactorily; (3) that the plaintiff suffered an adverse

employment action; and (4) that the plaintiff's employer treated the plaintiff differently than a

similarly situated employee who does not belong to the same protected class as the plaintiff."

1  *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006) (citing *McDonnell*

2  *Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  "Alternatively, a plaintiff can prevail

3  merely by showing direct or circumstantial evidence of discrimination; he or she does not need

4  to use the *McDonell Douglas* framework to establish a *prima facie* case." *Hittle v. City of*

5  *Stockton, California*, 101 F.4th 1000, 1012 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 759 (2025).

6  A plaintiff may establish a prima facie case by demonstrating "an inference of discrimination in

7  whatever manner is appropriate in the particular circumstances." *Diaz v. Am. Tel. & Tel.*, 752

8  F.2d 1356, 1361 (9th Cir. 1985).  This may be through a comparison to similarly situated

9  individuals, or any other circumstances "surrounding the adverse employment action [that] give

10  rise to an inference of discrimination." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th

11  Cir. 2010) (quotation omitted).

12         **i. Pleading Standard**

13       The Aces argue that because Hamby has not alleged direct or circumstantial evidence of

14  discrimination, she must establish a prima facie case for Title VII discrimination through the

15  *McDonnell Douglas* framework, but she has failed to plead sufficient facts to do so.  Hamby

16  counters that the burden-shifting framework in *McDonnell Douglas* is an evidentiary, not

17  pleading, standard, and she has sufficiently pleaded a claim under the proper pleading standard

18  for Title VII discrimination claims outlined in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506

19  (2002).

20       A plaintiff does not need to prove a prima facie case of discrimination to survive a Rule

21  12(b)(6) motion because the burden-shifting framework in *McDonnell Douglas* "is an

22  evidentiary standard, not a pleading requirement." *Swierkiewicz*, 534 U.S. at 510-11.  Whether a

23  plaintiff has set forth a prima facie case under *McDonnell Douglas* "often requires discovery to

1  fully adduce," and analysis under this standard is therefore more appropriate for a summary

2  judgment motion, rather than a motion to dismiss. *McGary v. City of Portland*, 386 F.3d 1259,

3  1262 (9th Cir. 2004) (citing *Swierkiewicz*, 545 U.S. at 510-11).

4      While the Aces argue that *Swierkiewicz* has been overruled by *Twombly* and *Iqbal*, the

5  Supreme Court in *Twombly* expressly confirmed *Swierkiewicz*'s compatibility with the current

6  pleading standard.  There, the Court expressed that in *Swierkiewicz*, it did "not require

7  heightened fact pleading of specifics, but only enough facts to state a claim to relief that is

8  plausible on its face." *Twombly*, 550 U.S. at 569-70.  Affirming this reading, the Ninth Circuit

9  has also recognized that notwithstanding any tension between *Swierkiewicz* and *Twombly*/*Iqbal*,

10  there are two common principles to both cases.  "First, to be entitled to the presumption of truth,

11  allegations in a complaint . . . may not simply recite the elements of a cause of action, but must

12  contain sufficient allegations of underlying facts to give fair notice and to enable the opposing

13  party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1215–16 (9th Cir. 2011).

14  "Second, the factual allegations that are taken as true must plausibly suggest an entitlement to

15  relief, such that it is not unfair to require the opposing party to be subjected to the expense of

16  discovery and continued litigation." *Id.*

17      Thus, Hamby does not need to prove the elements of her Title VII discrimination claim to

18  survive a Rule 12(b)(6) motion; she is required only to plead a plausible claim of discrimination.

19  While pleading a plausible *prima facie* case of discrimination under *McDonnell Douglas* is

20  sufficient to overcome a motion to dismiss, it is not necessary to do so. *See Sheppard v. David*

21  *Evans & Assoc.*, 694 F.3d 1045, 1050 n.2 (9th Cir. 2012).  Hamby may also state a plausible

22  claim by alleging direct or circumstantial evidence of discrimination, or otherwise sufficiently

23  alleging facts that give rise to a reasonable inference of discrimination. *See Hittle*, 101 F.4th at

1  1012 (noting that a plaintiff may establish a case for Title VII discrimination "merely by

2  showing direct or circumstantial evidence of discrimination; he or she does not need to use the

3  *McDonnell Douglas* framework to establish a *prima facie* case."); *Diaz*, 752 F.2d at 1361

4  ("[P]laintiffs in some cases may seek to establish a *prima facie* case by other means . . . [they]

5  may demonstrate an inference of discrimination in whatever manner is appropriate in the

6  particular circumstances.").

7        **ii.  Adverse Employment Action, Reasonable Inference of Discrimination by**
   **Decisionmaker, and Similarly Situated Individuals Outside Protected**
8        **Class Treated More Favorably**

9        The Aces argue that Hamby's discrimination claims fail because she has not plausibly

10  alleged her trade caused harm related to the terms and conditions of her employment as required

11  for a Title VII discrimination claim under *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346,

12  359 (2024).  They also argue that Hamby has not sufficiently alleged direct or circumstantial

13  evidence of discrimination, and she has not established a prima facie case under *McDonnell*

14  *Douglas* nor plausibly pleaded her claim under any other standard, because she has not

15  sufficiently alleged certain necessary facts.  These facts include that Hammon was an Aces

16  decisionmaker and that there were similarly situated individuals treated more favorably than

17  Hamby.

18        Hamby responds that she has stated that the trade caused harm to the terms and

19  conditions of her employment, including loss of brand prestige, loss of promotional opportunities

20  exclusive to the Las Vegas sports market, additional tax burden by moving to Los Angeles,

21  reputational harm from a lost opportunity to participate in back-to-back WNBA championships,

22  monetary losses, and emotional distress.  She also counters that the *McDonnell Douglas*

23  framework is an evidentiary, not pleading, standard and that she has sufficiently alleged facts

1    regarding her pregnancy and the circumstances of her trade to the Los Angeles Sparks to support

2    a discrimination claim.

3        The Aces reply that Hamby's allegations, including Hammon's purported comments

4    about her pregnancy, do not constitute direct evidence of discrimination, and because Hamby has

5    not alleged Hammon was a decisionmaker, the comments also do not suffice as circumstantial

6    evidence. They reiterate that because of this lack of evidence, Hamby must establish a prima

7    facie case under *McDonnell Douglas*, which she has failed to do.

8        As I addressed above, *McDonnell Douglas* is an evidentiary standard rather than a

9    pleading requirement, and a plaintiff does not have to meet its burden-shifting framework to

10   survive a motion to dismiss. To survive a Rule 12(b)(6) motion, Hamby need only plead a

11   plausible claim for relief.

12       First, she has plausibly alleged that the trade harmed her with respect to the terms and

13   conditions of her employment. In *Muldrow*, the Supreme Court ruled that a plaintiff claiming

14   Title VII discrimination based on a transfer to a different position "need show only some injury

15   respecting her employment terms or conditions." 601 U.S. at 359. "The transfer must have left

16   her worse off, but need not have left her significantly so." *Id.* As relevant here, the plaintiff in

17   *Muldrow* was transferred from a "job in a prestigious specialized division . . . [with] frequent

18   opportunity to work with police commanders" into another position where she was "less

19   involved in high-visibility matters" and lost certain perks, including a take-home car. *Id.* The

20   Court concluded that these changes left the plaintiff sufficiently worse off from the transfer to

21   constitute an adverse employment action, and it "d[id] not matter . . . that her rank and pay

22   remained the same, or that she still could advance to other jobs." *Id.*

23

Here, Hamby has plausibly alleged that the trade to the Los Angeles Sparks caused her harm beyond the trade itself. Like the plaintiff in *Muldrow*, Hamby alleges the trade to the Sparks resulted in a loss of prestige, as she was relegated to playing for a "less competitive team." ECF No. 1 at 10-11. She states that this "resulted in a loss of reputational prestige and brand value typically associated with being part of a two-time WNBA champion franchise." *Id.* The trade also allegedly resulted in Hamby losing opportunities and perks associated with being an Aces player, including "marketing and/or endorsement opportunities in the Las Vegas sports market that were not available to her in the Los Angeles sports market, a far more saturated endorsement market." *Id.* at 11. She therefore has plausibly alleged that being traded to the Sparks resulted in harm separate from the transfer itself respecting the terms and conditions of her employment.

Second, although Hamby does not directly allege that Hammon was a decisionmaker, she alleges facts that support a reasonable inference that Hammon was a decisionmaker, was authorized by Aces decisionmakers to communicate their own views, or otherwise influenced the decisionmaking process on Hamby's trade. *See Bergene v. Salt River Project Agr. Imp. & Power Dist.*, 272 F.3d 1136, 1141 (9th Cir. 2001) ("Even if a manager was not the ultimate decisionmaker, that manager's retaliatory motive may be imputed to the company [in a Title VII claim] if the manager was involved in the [adverse employment] decision."); *see also Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007) ("[T]he subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process."). Hamby states that Hammon is the Aces' head coach, which could be a leadership role within the Aces organization with decisionmaking powers and

1  influence over hiring or firing players.  Moreover, Hammon allegedly was the Aces

2  representative who informed Hamby of the Aces' decision to trade her to the Sparks on January

3  15, and then to again communicate the trade to Hamby on a January 16 call.  Hamby also alleges

4  that Hammon spoke about the Aces' purported views on her pregnancy and role in the team,

5  saying that the Aces needed bodies, that the Aces staff believed she would get pregnant again,

6  and that "no one expected her to get pregnant again." ECF No. 1 at 7.  Hamby states she twice

7  asked Hammon, "'[y]ou're trading me because I'm pregnant?'" to which Hammon did not

8  respond except to say, "'what do you want me to do?'" *Id.* at 8.  Interpreting these allegations in

9  the light most favorable to Hamby, it is reasonable to infer that Hammon was an Aces

10  decisionmaker herself, was authorized to speak on behalf of Aces decisionmakers, or otherwise

11  influenced the decisionmaking process.

12        Hamby also plausibly alleges the Aces and Hammon were aware of her pregnancy and

13  were motivated by it to trade her to the Sparks.  She states she signed her contract extension in

14  late June 2022, and subsequently learned of her pregnancy about three weeks later.  She

15  allegedly then communicated her pregnancy to Aces players and staff, including head coach

16  Hammon and general manager Natalie Williams, as well as publicly at the Aces' championship

17  celebration.  Following her public announcement, the Aces allegedly began to treat Hamby

18  differently, including reneging on incentives they promised her when she signed the contract

19  extension.  She states that Williams and Aces president Nikki Fargas did not answer when they

20  would pay for Hamby's daughter's private school tuition, and that Williams instructed her to

21  vacate Aces-provided housing with no explanation.  Then, on the January 15 call, Hammon

22  allegedly accused Hamby of being aware of her pregnancy when she signed her contract

23  extension and told her that no one on the Aces expected her to become pregnant.  Hamby further

alleges that during the same call, Hammon told Hamby that she was not taking her team and workout commitments seriously, that she was not going to be ready to play at the start of the next season, and that the Aces expected she would become pregnant a third time.  When Hamby allegedly twice directly questioned Hammon and asked her if she was trading her because she was pregnant, Hammon allegedly did not deny this and instead responded "'what do you want me to do?'" *Id.*  Hammon allegedly called Hamby the next day to inform her that she would be traded, and five days later, the Aces traded Hamby to the Sparks, about seven months after Hamby had signed her two-year contract extension.  These allegations, interpreted in the light most favorable to Hamby, support a reasonable inference that Aces decisionmakers were unlawfully motivated by Hamby's pregnancy in trading her to the Sparks.

Finally, Hamby does not have to specifically state that there were similarly situated individuals outside her class who were more favorably treated because a plaintiff bringing a Title VII discrimination claim may show an inference of discrimination in "whatever manner [] appropriate under the particular circumstances" including circumstances "surrounding the adverse employment action [that] give rise to an inference of discrimination." *Hawn*, 615 F.3d at 1156 (quotation omitted).  The allegations above regarding the circumstances of Hamby's two-year contract extension, her pregnancy announcement, the comments made to her, and the subsequent trade to the Sparks allow for a reasonable inference that the Aces discriminated against Hamby due to her pregnancy.  Hamby has therefore plausibly stated claims for discrimination based on her pregnancy under Title VII and NRS § 613.330, and I deny the Aces' motion to dismiss them.

/ / / /

/ / / /

**b. Retaliation**

Title VII prohibits employers from discriminating against employees in retaliation for opposing "any practice made an unlawful employment practice by this subchapter" or for "charg[ing], testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  Retaliation claims brought under NRS § 613.340 are analyzed under the same principles as Title VII retaliation claims. *See Pope*, 114 P.3d at 281.

To state a retaliation claim, a plaintiff must allege that she "engaged in protected activity, that she suffered a materially adverse action, and that there was a causal relationship between the two." *Westendorf v. W. Coast Contractors of Nev., Inc.*, 712 F.3d 417, 422 (9th Cir. 2013).  "An employee engages in protected activity when she opposes an employment practice that either violates Title VII or that the employee reasonably believes violates that law." *Id.*  An adverse employment action means "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir. 2000) (quotation omitted).  "[M]ere ostracism by co-workers does not constitute an adverse employment action." *Id.* at 1241 (quotation omitted).

"Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).  "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 360.  Causation "may be inferred from proximity in time between the protected action and the allegedly retaliatory employment decision." *Ray*, 217 F.3d at 1244 (quotation omitted).  The plaintiff "must make some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that

1  the plaintiff had engaged in protected activity." *Raad v. Fairbanks N. Star Borough Sch. Dist.*,

2  323 F.3d 1185, 1197 (9th Cir. 2003), *opinion amended on denial of reh'g*, No. 00-35999, 2003

3  WL 21027351 (9th Cir. May 8, 2003).  However, as I addressed above, Hamby need only allege

4  facts sufficient to state a plausible claim for relief; she does not need to establish a prima facie

5  case to survive a motion to dismiss.

### i.  Causation - Awareness by Decisionmaker

7       The Aces argue that because Hamby has not offered direct or circumstantial evidence of

8  retaliation, she must establish a prima facie case under the *McDonnell Douglas* burden-shifting

9  standard.  They assert she has failed to state a claim under that standard because she has not

10 sufficiently alleged a causal connection between her protected activity (her January 21 social

11 media post alleging discrimination against the Aces)[1] and the alleged retaliatory acts.

12 Specifically, they argue she did not allege that the unnamed Aces employees who retaliated

13 knew about her social media post.

14       Hamby responds that she has plausibly stated a claim for retaliation under the applicable

15 pleading standard.  She also argues that she sufficiently alleged that the Aces were aware of her

16 social media post, as her complaint notes the Aces posted on their official X account about the

17 WNBA initiating an investigation into her social media allegations.  The Aces reply that their

18 social media post announcing the investigation does not sufficiently allege the requisite

19 awareness of her protected activity by a decisionmaker because she does not identify who

20 engaged in the retaliatory actions.

---

[1] The Aces note that they do not concede that the social media post constituted protected activity because they contend that Hamby acted in bad faith and made a false accusation of discrimination. ECF No. 12 at 6.  But they do not appear to contest, at least for purposes of this motion, that a true or not knowingly false social media post would qualify as protected activity.

Hamby has plausibly alleged that she had engaged in protected activity through posting on her social media opposing the Aces' treatment of her following her pregnancy announcement as well as their decision to trade her, stating she believed these actions to be discriminatory.[2] *See Westendorf*, 712 F.3d at 422; *see also Clark v. Johanns*, 460 F.3d 1064, 1067 (8th Cir. 2006) (noting that protected activity under Title VII included filing a complaint or otherwise "publicly oppos[ing] a discriminatory practice.").  She also plausibly alleges that the Aces were aware of her post prior to each instance of retaliation.  She states that on January 23, the executive director of the WNBA Player's Association sent an email to the WNBA's general counsel requesting an investigation into her January 21 social media allegations, and that on February 8, the Aces announced on their official X account that the WNBA had launched a formal investigation. Hamby also states that each of the alleged retaliatory acts took place after her post.  Interpreting these facts in the light most favorable to Hamby, it is reasonable to infer that because the Aces allegedly posted about the WNBA's investigation into Hamby's social media allegations, Aces leadership knew about the investigation and approved or were aware of the announcement on their official X profile, and thus were aware of Hamby's social media post prior to the alleged retaliatory actions.  Thus, Hamby plausibly alleges that the Aces were aware of her protected activity before retaliating.

Although the Aces argue that Hamby must allege specifically who retaliated against her and that the specific actors were aware of her social media post prior to retaliating, she is not required to do so at this stage of the proceedings.  Hamby has sufficiently pleaded facts to reasonably infer that the Aces directly retaliated against her or directed staff to retaliate.  Hamby

---

[2] Again, the Aces do not argue, for the purposes of this motion, that a true or not knowingly false social media post does not qualify as protected activity under Title VII.

1    alleges that following her January 21 post, the Aces directed players and staff to cease

2    communicating with her, and that the general manager allegedly commented on a public radio

3    interview that Hamby and the Aces were aware of her pregnancy since June 2022.  The Aces

4    also allegedly attempted to wrongfully acquire Hamby's medical records, did not extend her an

5    invitation to a White House visit with then-Vice President Kamala Harris celebrating the Aces'

6    first WNBA championship, and also directed its videography staff to not display her daughter on

7    the Aces' stadium screen during a September 17, 2023 game.  That is sufficient to overcome the

8    Aces' motion to dismiss.

9              **ii.  Causation – But-For Causation**

10            The Aces argue that Hamby has failed to sufficiently allege but-for causation because she

11    has not alleged certain facts, including who issued the directives and to whom.  They also argue

12    that there are other explanations for the alleged retaliatory acts.  Hamby responds that her

13    complaint satisfies the pleading standard, and she is not required to prove causation at this stage.

14            "[E]vents have multiple but-for causes," and "the adoption of the traditional but-for

15    causation standard means a defendant cannot avoid liability just by citing some other factor that

16    contributed to its challenged employment decision." *Bostock v. Clayton Cnty., Georgia*, 590 U.S.

17    644, 656 (2020) (emphasis omitted).  To meet the but-for causation standard, a plaintiff need

18    only show that their protected activity "was one but-for cause of that decision." *Id.*  Thus,

19    contrary to the Aces' argument, it does not matter that there could be other explanations for the

20    adverse actions, so long as Hamby pleads facts showing that it is "more than a sheer possibility"

21    that retaliation was a but-for cause of the alleged actions. *See Iqbal*, 556 U.S. at 678.

22            Similarly, Hamby does not need to allege every detail about the retaliatory acts, including

23    the identities of specific actors that she might not know prior to discovery, so long as she alleges

enough facts to state a plausible claim for relief. Here, Hamby states that after she engaged in protected activity by posting allegations of discrimination on social media, the Aces directly engaged in or directed at least five actions to retaliate against her post. Hamby has therefore plausibly alleged that each of the instances of purported retaliation might not have happened if not for her social media post.

### iii. Causation - Temporal Proximity

The Aces argue that Hamby has not plausibly alleged causation via temporal proximity because she has not listed the dates of some of the retaliatory acts. For those acts where Hamby has identified the dates, the Aces argue that the acts are too far removed in time from the protected activity. Hamby responds that she is not required to plead specific dates to establish causation. She argues that she plausibly alleges a causal link even if the retaliation is farther removed in time from her protected activity because those were the Aces' first opportunities to retaliate. In reply, the Aces stress that Hamby has not alleged any dates for certain events, so it is impossible to plausibly allege temporal proximity. They also contend that the retaliatory acts were not the first instances that the Aces could have retaliated.

A plaintiff may establish a causal link between her protected act and the alleged retaliatory action through showing temporal proximity or by other evidence that shows that the employer would not have taken the retaliatory action but-for the plaintiff's protected act. *Ray*, 217 F.3d at 1244. The cases that accept temporal proximity uniformly hold that the timing must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (quotation omitted). There is no temporal proximity, for example, when the gap between the protected activity and alleged retaliation is three months or longer. *Id.* However, the Ninth Circuit has previously ruled that the lack of temporal proximity does not necessarily preclude finding causation if the alleged

retaliator did not have an earlier opportunity to retaliate. *See Porter v. California Dep't of Corr.*, 419 F.3d 885, 894-96 (9th Cir. 2005) (finding there was still a triable issue on causation despite a two-year gap between the protected activity and alleged retaliation because there was no sooner opportunity to retaliate).

Hamby has plausibly alleged a causal link between her protected activity and two of the five instances of alleged retaliation, but she has failed to do so for three alleged instances. Hamby posted her allegations of discriminatory treatment by the Aces on her social media account on January 21, 2023. The White House visit took place in late August 2023. ECF Nos. 12 at 9; 30 at 10. Hamby alleges the video screen incident took place at an Aces game on September 17, 2023. The Aces are correct that the approximate eight- and nine-month gaps between Hamby's social media post and these two alleged retaliatory acts are too long as a matter of law to plausibly allege temporal proximity. However, because these could have been the first opportunities that the Aces had to retaliate in those specific ways, Hamby plausibly alleges a causal link for these two alleged instances of retaliation.

However, she has not plausibly alleged a causal link for: (1) the alleged directive to Aces players and staff to cease communicating with her, (2) the alleged public comment by the Aces' general manager implying Hamby and the Aces were aware of her pregnancy since June 2022, and (3) the Aces' alleged attempt to obtain her medical records. Hamby has not indicated when each of these alleged acts happened except that they happened after her social media post. ECF No. 1 at 11. Because these allegations are almost entirely unanchored to specific dates or time periods, there is no reasonable inference of temporal proximity. Nor is there a reasonable inference that the Aces had no previous opportunities to retaliate in these ways. Thus, because Hamby has not plausibly alleged a causal link for these three instances, I dismiss her retaliation

1  claim to the extent it arises from these three allegations.  But I grant her leave to amend if facts

2  exist to do so.  I deny the Aces' motion to dismiss the retaliation claim to the extent it arises from

3  the other two allegations.

4  **B.  <u>WNBA</u>**

5       **a.  Retaliation based on Failure to Properly Investigate and Adequately Remediate**

6       The WNBA argues that Hamby's retaliation claim fails because she does not plausibly

7  allege that the WNBA is her employer, and only employers may be sued under Title VII and

8  NRS § 613.340.  It also argues that the alleged failure to properly investigate and remediate are

9  not adverse employment actions.  Finally, the WNBA argues that Hamby is precluded from

10  suing the WNBA under NRS § 613.340 because she was not employed in Nevada at the time of

11  the alleged retaliatory acts.

12       Hamby counters that the WNBA is a joint employer with the Aces.  She also argues that

13  its failure to properly investigate and remediate are adverse employment actions because that

14  conduct could dissuade a reasonable worker from making or supporting a discrimination charge.

15  Hamby does not dispute that she was no longer employed in Nevada at the time of the retaliatory

16  acts.  But she argues that Nevada courts allow for post-employment retaliation claims, and the

17  WNBA's alleged retaliatory acts arose out of Hamby's employment in Nevada as an Aces

18  player.

19       The WNBA replies that Hamby did not plausibly allege facts detailing that the WNBA

20  exercised a level of control over her work necessary to constitute joint employment.

21  Alternatively, it argues that, as a general rule, courts in the Ninth Circuit have held that a failure

22  to properly investigate is not an adverse employment action.  It asserts that Hamby's claim does

23  not fall within an exception to that general rule because she does not allege that its failure to

investigate was to retaliate for a separate, earlier complaint.  It also argues that by NRS § 613.340's plain language, the statute does not apply to "[a]ny employer with respect to employment outside this state."

An adverse employment action in a Title VII retaliation claim is not limited to those actions that "affect the terms and conditions of employment." *Burlington Northern & Santa Fe Railway Co. v. White* 548 U.S. 53, 63-64 (2006).  Rather, "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace." *Id.* (emphasis omitted).  Title VII retaliation therefore "extends beyond workplace-related or employment-related retaliatory acts and harm" to those retaliatory actions that would "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." *Id.* at 67-68 (quotation omitted).

Still, courts have consistently ruled that certain conduct does not constitute an adverse employment action for the purposes of a Title VII retaliation claim, including the failure to properly investigate and remediate.  These courts reason that inadequate or absent investigations and remediation alone do not necessarily leave the employee worse off than if the investigation never took place or the remediation never occurred.  And because the employee does not suffer additional harm or injury arising from the employer's efforts or non-efforts to investigate and remediate, it is not adverse treatment and would not dissuade a reasonable employee from engaging in protected activity.[3]  Courts have also expressed the concern that if such failures to

---

[3] *See Ray*, 217 F.3d at 1242-43 (9th Cir. 2000) (noting that an adverse employment action under Title VII retaliation must be some type of "adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity" (quotation omitted)); *Chesley v. City of Mesquite*, No. 2:21-cv-01946-ART-DJA, 2023 WL 5206925, at *5 (D. Nev. Aug, 14, 2023) ("Courts generally refuse to consider a failure to investigate an adverse employment action." (gathering cases)); *Doe No. 1 v. Wynn Resorts, Ltd.*, No. 2:19-cv-01904-GMN-VCF, 2023 WL 1782439, at *16 (D. Nev. Feb. 3, 2023) (holding an

1  act upon employee complaints were deemed to be cognizable adverse employment actions,

2  employees could potentially bring a Title VII claim for any perceived discrepancy from their

3  subjective expectations of a proper investigation or remedy.  This would mean potentially

4  incentivizing officials against undertaking investigations in the first place for fear of liability.  *See*

5  *McKissick*, 2019 WL 3241161, at *12 ("[A]ccepting Plaintiffs' reliance on the handling of the

6  investigations to establish adverse employment action would erode the policy reason for

7  encouraging employers to investigate complaints for fear that an investigation would lead to a

8  claim of retaliation based on an inadequate investigation.").

9      One exception to this general rule is when the employee alleges that the employer failed

10  to investigate as retaliation for an employee's earlier, separate protected act.  In this scenario, the

11

12  alleged failure to investigate "do[es] not rise to the level of an adverse employment action, even
for a retaliation claim" and "leaves an employee no worse off than before the complaint was

13  filed" (quotation omitted)); *Kurdi v. California Dep't of Transportation*, No. 1:22-cv-00729-
JLT-EPG, 2023 WL 267538, at *8 (E.D. Cal. Jan. 18, 2023) ("The failure to investigate

14  generally does not amount to an adverse action."); *McKissick v. City of Reno*, No. 3:17-cv-
00458-MMD-CBC, 2019 WL 3241161, at *12 (D. Nev. July 18, 2019) (ruling that an alleged

15  inadequate investigation, including not interviewing certain individuals and inadequate
remediation, did not constitute adverse employment actions because plaintiffs could not show

16  they were materially harmed); *Cozzi v. Cnty. of Marin*, 787 F. Supp. 2d 1047, 1069 (N.D. Cal.
2011) ("In general, the failure to conduct an adequate investigation after an alleged act of

17  discrimination . . . cannot be considered an action that reasonably would deter an employee from
engaging in the protected activity under Title VII."); *McEnroe v. Microsoft Corp.*, No. CV-09-

18  5053-LRS, 2010 WL 4806864, at *5 (E.D. Wash. Nov. 18, 2010) ("Even had [Defendant]
actually ignored Plaintiff's complaints, that mere failure to investigate itself did not adversely

19  affect the terms or conditions of Plaintiff's employment."); *see also Chuang v. Univ. of
California Davis, Bd. of Trs*., 225 F.3d 1115, 1126 (9th Cir. 2000) (noting that for the purposes

20  of a Title VII discrimination claim, "[t]he lack of a response [to grievances] does not amount to
an adverse employment action."); *Brown v. Dep't of Pub. Safety*, 446 F. App'x 70, 72-73 (9th

21  Cir. 2011) (ruling that a failure to investigate was not an adverse employment action for the
purposes of a Title VII discrimination claim without evidence of discriminatory rationale);

22  *Daniels v. United Parcel Serv., Inc*., 701 F.3d 620, 640 (10th Cir. 2012), *abrogated in part on
other grounds by Muldrow*, 601 U.S. at 355-56 ("[A] failure to investigate an internal complaint

23  cannot be considered retaliatory in the circumstances here . . . unless it leads to demonstrable
harm, [as it] leaves an employee no worse off than before the complaint was filed.").

failure to investigate qualifies as retaliation because the employee suffered additional harm from the employer's retaliatory choice to not act upon the employee's second complaint, separate from any initial failure to investigate or remediate. *See Doe No. 1*, 2023 WL 1782439, at *16 (noting that the "failure to investigate could constitute an adverse employment action if the failure was in retaliation for a separate protected act" (quotation omitted)); *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 722 (2d Cir. 2010) (stating that employer's failure to investigate a complaint could be considered an adverse employment action "if the failure is in retaliation for some separate, protected act by the plaintiff"); *Rochon v. Gonzales*, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006) (ruling that an employer's failure to investigate a death threat made against an employee following the employee's separate, earlier discrimination complaint constituted an adverse employment action in retaliation claim).

Here, Hamby's allegations do not support a Title VII retaliation claim. Hamby does not allege that the WNBA's inadequate investigation and remediation were accompanied by additional harm that would have not occurred if not for their asserted failures. She also does not allege that the WNBA failed to properly investigate and remediate her January 21 social media post to retaliate against a separate, earlier complaint or protected act. Because she cannot allege that the WNBA's failure to properly investigate and remediate are adverse employment actions, her retaliation claims under Title VII and NRS § 613.340 based upon these allegations fail as a matter of law, and I dismiss her claims with prejudice because amendment would be futile.

### b. Retaliation Based on Non-renewal of Marketing Contract

The WNBA argues that Hamby's retaliation claims based on the non-renewal of her marketing contract also fail because: (1) she did not and cannot exhaust her administrative remedies, (2) she was an independent contractor under the marketing agreement, and (3) she

1  cannot establish a causal link between her social media post and the non-renewal.  Hamby

2  responds that she has fulfilled the exhaustion requirement because the allegations could be

3  reasonably be expected to grow out of her EEOC charge where she alleged the WNBA failed to

4  properly investigate and remediate.  She also contends that the non-renewal is a type of

5  retaliation covered under *Burlington Northern* because the doctrine broadly includes conduct

6  outside the workplace.  Hamby asserts that she plausibly alleges a causal link because the non-

7  renewal was the first opportunity for the WNBA to retaliate in that way.  She also argues that she

8  engaged in additional protected activity by filing and amending the EEOC charge within a month

9  of the non-renewal.

10     The WNBA replies that the non-renewal allegations do not fall within the scope of the

11  EEOC charge related to the alleged failure to investigate and cannot be reasonably be expected

12  to grow out of it because the allegations in the charge or amended charge are specific to the

13  WNBA's investigation, and Hamby did not allege a broader pattern of retaliation.  It reiterates

14  that Hamby was an independent contractor and that there is a lack of temporal proximity

15  between her social media post and the alleged retaliation.

16     "Under Title VII, a plaintiff must exhaust her administrative remedies by filing a timely

17  charge with the EEOC, or the appropriate state agency, thereby affording the agency an

18  opportunity to investigate the charge." *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1099 (9th

19  Cir. 2002), *as amended* (Feb. 20, 2002), *overruled on other grounds by Fort Bend Cnty., Texas v.*

20  *Davis*, 587 U.S. 541 (2019).  This gives "the charged party notice of the claim and narrow[s] the

21  issues for prompt adjudication and decision." *Id.* (quotation omitted).  Complainants must file a

22  charge with the EEOC "within one hundred and eighty days after the alleged unlawful

23  employment practice occurred," or 300 days if the complainant files a charge with a state or local

24

1  agency that also has authority to grant relief related to the alleged unlawful employment practice.

2  42 U.S.C. § 2000e-5(e)(1).  Under NRS § 613.430, complainants must file their complaint with

3  the Nevada Equal Rights Commission (NERC) within 180 days of the alleged unlawful practice.

4      "Incidents of discrimination not included in an EEOC charge may not be considered by a

5  federal court unless the new claims are like or reasonably related to the allegations contained in

6  the EEOC charge." *Lyons v. England*, 307 F.3d 1092, 1104 (9th Cir. 2002) (quotation omitted).

7  Thus, a court may consider such claims that either "fell within the scope of the EEOC's actual

8  investigation or an EEOC investigation which can reasonably be expected to grow out of the

9  charge of discrimination." *B.K.B*, 276 F.3d at 1100 (simplified).  When the allegations do not fall

10  within the scope of the EEOC charge, "the court should consider [a] plaintiff's civil claims to be

11  reasonably related to allegations in the charge to the extent that those claims are consistent with

12  the plaintiff's original theory of the case." *Id.*

13      Hamby admits she did not include allegations related to the WNBA's non-renewal of her

14  marketing contract in her original or amended charge with the EEOC, both of which were filed

15  prior to the expiration of her marketing contract on October 28, 2023.[4]  *See* ECF Nos. 31 at 12-

16  13; 14-2 at; 14-3 at 2.  An investigation into those allegations could not reasonably be expected

17  to grow out of her original or amended EEOC charges because she alleged only that the WNBA

18

19  _____

20  [4] Typically, "a district court may not consider any material beyond the pleadings in ruling on a
   Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (quotation
   omitted).  However, a court may consider documents that are not physically attached to the

21  complaint without converting the motion to a summary judgment motion "if the documents'
   authenticity is not contested and the plaintiff's complaint necessarily relies on them." *Id.*

22  (simplified).  Hamby's retaliation claim against the WNBA arises from the alleged non-renewal
   of her marketing contract, but she did not attach a copy of the contract to her complaint.  The

23  WNBA has attached a copy to its opposition, and Hamby has not disputed its authenticity.
   Therefore, I may consider Hamby's marketing contract without converting the motion to dismiss
   into a motion for summary judgment.

failed to properly investigate and remediate her complaint about the Aces and mentioned nothing about the non-renewal. *See* ECF Nos. 14-2 at 2-3; 14-3 at 2-3. Hamby's allegations about the investigation and remediation are too far removed both in subject matter and time from the alleged non-renewal of her marketing contract. The EEOC charge also does not allege any facts suggesting a broader pattern of retaliation or any other allegation connecting the investigation to the non-renewal which could allow me to construe them as being reasonably related.

At the time the WNBA did not renew her contract, Hamby could have filed a new charge with the EEOC or amended her original charge, but she apparently did not. The WNBA allegedly did not renew her marketing contract in 2023.[5] Accordingly, the deadline to file a charge with the EEOC based on the non-renewal allegations ran long ago. Hamby is thus barred from filing a new charge based on the alleged non-renewal. Because Hamby has not exhausted her administrative remedies and the deadline to amend or file a new charge has passed, I dismiss this claim with prejudice because amendment would be futile.

Accordingly, I deny Hamby's motion for leave to file the proposed amended complaint as moot because she proposes adding allegations about the WNBA's Collective Bargaining Agreement that apply only to Hamby's claims against the WNBA. *See* ECF Nos. 32 at 7-8; 32-1 at 4-5. I also deny the motion for leave to file a brief as amici curiae because potential amici's arguments also pertain only to Hamby's claims against the WNBA.

**III.    CONCLUSION**

I THEREFORE ORDER that defendant WNBA's motion to dismiss **(ECF No. 14) is GRANTED.**

---

[5] The contract terms state that the contract would "expire on the tenth day following the last game of the WNBA Finals 2023." ECF No. 14-1 at 2.

1    I FURTHER ORDER Hamby's motion for leave to submit a first amended complaint

2 **(ECF No. 32) is DENIED.**

3    I FURTHER ORDER that the motion for leave to file a brief as amici curiae **(ECF No.**

4 **34) is DENIED.**

5    I FURTHER ORDER that the Aces' motion to dismiss **(ECF No. 12) is GRANTED in**

6 **part** as follows:

7    I dismiss with leave to amend Hamby's claims for retaliation under Title VII and NRS

8 § 613.340 against the Aces (claim two) arising from her allegations of:

9        (1) the Aces' directive to Aces players and staff to cease communications with Hamby,

10        (2) the Aces general manager, Natalie Williams, erroneously implying on a public radio

11            interview that the Aces and Hamby were aware of Hamby's pregnancy since June

12            2022, and

13        (3) the Aces attempt to obtain Hamby's medical records.

14 I deny the Aces' motion in all other respects.

15    I FURTHER ORDER that if Hamby wishes to file an amended complaint curing the

16 deficiencies discussed in this order, she may do so by June 6, 2025.  If Hamby does not timely

17 amend, the following claims will proceed:

18        (1) Discrimination under Title VII and NRS § 613.330 against the Aces (claim one), and

19        (2) Retaliation under Title VII and NRS § 613.340 against the Aces (claim two) arising

20            from the allegations of:

21 / / / /

22 / / / /

23 / / / /

27

(i)  the Aces not extending an invitation to the White House visit,

(ii)  the Aces prohibiting its videography staff from displaying Hamby's

daughter on the Aces' stadium screen.

DATED this 6th day of May, 2025.

_____

ANDREW P. GORDON
CHIEF UNITED STATES DISTRICT JUDGE